DAMMANN et al. v. THE CITY OF ST. LOUIS, Appellant.

Division One, November 14, 1899.

1. **Waterworks**: OPERATED BY CITY: INJURY TO PRIVATE PROPERTY. A city supplying water for compensation is responsible for damages resulting from an injury done to private property by the escape of water from the mains or reservoirs, if the escape is the result of the negligence of the employees of the city.

2. ———: ———: ———: NEGLIGENCE: ESTOPPEL. A city which maintains a system of waterworks for supplying private property with water for hire, is not estopped to deny that it is liable for injury to such property caused by water escaping from its pipes, because of the fact that its servants undertook to repair the injury.

3. ———: ———: ———: LAYING PIPES IN LOOSE SOIL: NEGLIGENCE: QUESTION FOR JURY. Where it may well be inferred, from the condition in which the water main was shown to be at the time of the break, that the cause of the break and of the consequent injury to private property, was the settling of the loose soil in which it was laid, the question of whether or not the employees of the city were guilty of negligence in laying such pipe in the loose soil without other foundation or support, is one for the jury.

4. ———: ———: ———: MEASURE OF DAMAGES. Where in a suit for damages to an injury to a private house caused by defectively constructed city waterworks, the evidence shows that the building had been erected less than two years, how and of what material it had been constructed, what it cost, in what condition it was at the time of the accident, the effect of the accident upon it, and how much it would cost to restore it to its original condition, there is sufficient evidence on which to base an instruction that the true measure of damages was the difference between the value of the building immediately before and immediately after the accident.

5. ———: ———: ———: REPAIRS: SATISFACTORY TO WITNESS. It is not competent for a city architect to testify that the city had "completely repaired a building" injured by water from the city's pipes, nor that the repairs were "perfectly satisfactory" to him. The sufficiency of the repairs is a matter to be determined by the jury, and not by the witness.

6. ———: ———: ———: EXCESSIVE DAMAGES. The jury are the judges of the credibility of witnesses, and where there is substantial evidence to support their verdict, it will not be disturbed as being excessive.

*Appeal from the St. Louis City Circuit Court.*—HON. JOHN A. TALTY, Judge.

AFFIRMED.

B. SCHNURMACHER and CHAS. CLAFLIN ALLEN for appellant.

(1) ، Plaintiff, Albert Dammann, admitted that he was not present while his household effects were being removed by excited neighbors, and did not know whether his losses were caused by the accident itself or by the manner in which his well-meaning friends threw the furniture out of doors; no other witnesses supplied these facts. Yet plaintiff was allowed to enumerate the articles in detail and to testify to their value. (2) And said plaintiff was allowed to testify to values respecting articles of furniture, although he admitted that his knowledge extended only to three specific articles, to wit, to two stoves and one spade; and that as to the rest he was merely making the best "guess" he could. While no special qualification as an expert is required to warrant a witness testifying to the value of household articles in common use, yet a disclaimer of even general knowledge certainly disqualifies the witness. (3) Said plaintiff was allowed to testify to cost prices paid more than two years before the accident; whereas, if defendant was liable at all, the measure of damage was the fair and reasonable value immediately prior to the accident. What he paid for the property was wholly immaterial. Spencer v. Vance, 57 Mo. 427; Horine v. Bone, 69 Mo. App. 481. (4) Said plaintiff having testified to the damage of two stoves, added that whether they were injured "in the falling of the house, or in taking them out, is what I can't say." No other witness

did say. Yet the court received evidence of value touching these articles. (5) And so also when Mrs. Dammann was on the stand, she admitted that she was unable to testify whether the furniture was damaged by the injury to the house, or by reason of the manner of its removal; yet she was allowed to describe in detail the character of the injuries and the condition of the furniture after it had been gathered up.

LUBKE & MUENCH for respondents.

(1)    The case presented clearly rendered the city liable for the damages inflicted upon plaintiffs. A municipal corporation is liable for the negligent performance of a ministerial duty. Under its charter it is authorized to establish a system of waterworks and to appoint a water commissioner, who shall have general charge of the entire waterworks department, laying of water pipe, etc., and to make charges for water furnished. Hence any neglect of those engaged in the operations of the city water department is the negligence of the city itself, and thus actionable. 2 Dillon on Mun. Corp. (4 Ed.), sec. 980; Fuchs v. City, 133 Mo. 179; Flori v. City, 3 Mo. App. 231; s. c. 69 Mo. 341; Carrington v. City, 89 Mo. 212. It is the neglect to discharge a duty purely ministerial. Dillon on Mun. Corp. (4 Ed.), sec. 1048; Donahoe v. City of Kansas, 136 Mo. 667; Thurston v. St. Joseph, 51 Mo. 510; Werth v. Springfield, 78 Mo. 107; Jones on Neg. of Mun. Corps., sec. 40. (2) By taking possession of plaintiffs' premises and undertaking to repair the damage it had caused, the city estopped itself from now denying its liability. It took from plaintiffs the possession of their own, and prevented them from making the repairs as they thought best. Chicago v. Sexton, 115 Ill. 230.,

BRACE, P. J.—The petition in this case in substance charges, that the plaintiffs are husband and wife, and owners

as tenants in fee by the entirety of lot No. 5, in city block 2717 "Gietner Place" in said city, on which was a substantial frame building, No. 2823 Neosho street, with rock foundation as well as necessary fences and out houses, and which was on the fifth of August, 1895, occupied by them and their family as a home.  That prior to the injuries herein complained of, the city of St. Louis did locate and place a main water pipe in the public street of said city in front of and adjoining the lot so owned by plaintiffs; but that the said water pipe or main was so carelessly and negligently, by the servants and employees of the said city in charge of the work of placing the same, laid or placed in and upon said street, that the same rested upon freshly filled and soft ground, without any adequate support to prevent the same from sinking and becoming leaky at and near a point opposite to plaintiffs' said premises.  And that the said defendant's officers and agents well knew, or by the exercise of ordinary care and caution could have known, that said water pipe, so placed by them, was in danger at any time of sinking and springing leaks at the joints thereof or elsewhere.

That the defendant did so carelessly and negligently maintain or keep the said water pipe, and did so carelessly and negligently fail to inspect or repair the same, that on or about the fifth day of August, 1895, the said main water pipe did sink, become leaky and burst, through the causes aforesaid, and thereupon large quantities of water were discharged from said pipe into the said loose and filled ground, which quantities of water did find their way and seep into the ground underlying plaintiffs' said house and did completely soften and undermine the foundation thereof, so that on or about said fifth day of August, 1895, plaintiffs' said house did suddenly collapse and fall, almost entirely destroying the same, and also destroying the furniture hereinafter mentioned, and compelling plaintiffs and their family

to suddenly flee therefrom to save themselves and some of their said property.

That thereupon the said defendant, the city of St. Louis, admitting and recognizing its said carelessness in the premises, as well as the responsibility for the damage and injury inflicted upon plaintiffs, did attempt to replace, re-erect and repair the said building and house of plaintiffs and restore it to its former usefulness, but that said city entirely failed in its efforts so to replace the same, in that the foundation to said building was rebuilt in an entirely unsafe and unsecure manner, permitting the said house to still further sink and become out of repair; in that the defendant failed to replace the chimney on said house as it had theretofore been and failed to properly replace the plastering, painting and other inside finish of said house, or to properly connect the walls, ceilings and roof of said house, or to cause the doors or windows to properly work, so that the said building is now still damaged in the sum of twelve hundred dollars.

That the furniture and personal property of plaintiffs was by and through the fall of said building and the enforced removal therefrom of plaintiffs in saving the same from entire destruction, injured to the extent of $95, and plaintiffs were compelled to pay for so removing the same the sum of $12. That plaintiffs, by reason of their inability to occupy their said home after the injury thereof as aforesaid, have been compelled to pay rent and reside elsewhere, to their damage in the sum of $100.

That plaintiffs have often demanded from defendant their damages as aforesaid, but defendant has wholly failed and refused to pay the same. Wherefore they pray judgment against defendant for the sum of fourteen hundred and seven dollars, together with interest thereon, and their costs.

The answer was a general denial.

In the course of the trial exceptions were saved to some of the evidence introduced in support of the allegations of

the petition, and at the close of plaintiffs' evidence, a demurrer thereto was interposed, overruled and exceptions saved. Exceptions were also saved to the action of the court in rejecting some evidence offered by the defendant. The case was submitted to the jury on instructions, to two of which defendant excepted. They are as follows:

"1. The court instructs the jury that if they find from the evidence that the flooding of plaintiffs' premises and the damage to their building and personal property, was caused by a leak in a public water main laid by the city of St. Louis in one of its public streets, and that such leak was directly caused by the negligent and unskillful laying of said pipe by the persons in charge of said work, or the failure on the part of the officers of defendant to exercise ordinary care or prudence in keeping the same in a safe condition, then their findings must be for the plaintiffs.

"2. If the jury find for the plaintiffs, then they will assess to them the difference in value of the building as it stood before the injury, and its value, as the jury shall find the same to have been, after said injury, less the actual value of any improvements or repairs made thereon by the defendant city; and the court further instructs the jury that if they find for the plaintiffs under other instructions given, they should include in their finding such damage, if any, as they find to have been directly caused by reason of the bursting of the water pipe in question, to any articles of personal property belonging to both plaintiffs together, as well as the reasonable expense of removing the same to a place of safety; and such expense by way of rental, as you may find the plaintiffs were compelled to pay for quarters elsewhere, until the delivery of possession of the plaintiffs' building by the defendant city."

The jury returned the following verdict: "We, the jury, find a verdict in favor of the plaintiffs in the sum of $1,000, as follows: $24 for rent, $12 for removing furniture,

$64 for damages to furniture, $900 for damages to the house."

From the judgment thereon the defendant appeals. The errors assigned for reversal are: The refusal to sustain the demurrer to the evidence, the giving of its instructions 1 and 3 for the plaintiffs, the admission of illegal evidence for the plaintiffs, the rejection of legal evidence for the defendant, and the refusal to set aside the verdict and grant a new trial on the ground that the verdict was excessive.

(1)   That the plaintiffs' property was injured by the escape of water from defendant's main line laid beneath the surface of the street on which their property abutted, and that the water escaped by reason of a break in the water pipe, is not disputed.   But it is contended that there was no evidence tending to prove that the pipe was negligently laid and maintained, and therefore the demurrer to the evidence ought to have been sustained.   William H. Lohman, a witness called in behalf of plaintiff, testified in substance, that he saw the water pipe laid; that it was a six-inch iron water main, in 15 feet lengths.   That it was laid beneath the surface of the street, in a trench 5 or 6 feet deep; that the soil in which the trench was dug and on the bottom of which the pipe was laid, was filled or made earth.   That the fill was about 15 or 18 feet deep; that it was made in 1891 by the workhouse men with yellow clay taken from a mound on Broadway.   That the pipe was laid in 1892; that it was laid right on the ground, in this made soil, which was dry and dusty when they laid the pipe in it; and they laid the pipe in the dust.   That he saw the place again on the day when the pipe burst; that where the break was the water had washed a hole to the surface and you could see the break.   The pipe was bent down and broken.   There was not much of the pipe exposed, but you could see it was broken and sagged down. The evidence also tended to prove that the earth with which the fill was made was dry when it was put in the fill.   That

when the pipe was laid it was very dry and dusty, and that the pipe rested upon no other foundation. That there was of this earth about ten feet beneath the pipe and about six feet on top of it. That the pipe was laid within a year after the fill was made and that both were done by the city authorities.

It also appeared from the plaintiffs' evidence that within four days after the injury Mr. Dammann received the following letter from the water commissioner of the city:

"Dear Sir:—In reference to the damage done to the premises known as No. 2823, Neosho street, by the bursting of a water main in Neosho street, the water department stands ready to repair damages and asks your permission to enter upon the said premises in order to make the necessary repairs."

To which Mr. Dammann replied on August 10th, as follows:

"Dear Sir:—Your communication of yesterday, referring to my building No. 2823 Neosho St., recently destroyed by water from the water main was duly received. In reply I beg to say, that I am informed by experts that the building can not be restored except by a complete reconstruction, including a foundation to a sufficient depth to go beyond the point where the water's action has softened and washed away the ground. I shall of course not accept any partial repair or restoration in satisfaction of my claim against the city; but I can not and do not, refuse you permission to enter my premises and occupy them for a reasonable time only in an effort to properly restore my building, to that end such permission is hereby granted."

Thereafter, on the August 21st, the following letter was addressed to the water commissioner by Mr. Dammann's attorneys, Lubke & Muench: "We have been spoken to by Mr. Albert Dammann, whose residence at No. 2823 Neosho St. was destroyed on August 5, '95, through the defective

water main.   He has shown us your communication of the 9th inst. asking permission to enter his premises for the purpose of endeavoring to restore the building.   Altho' permission was granted he informs us that nothing so far has been done.   Will you therefore kindly inform us whether it is proposed on the part of the city (or your department) to take any steps to restore Mr. Dammann's premises or to leave him to his own resources and remedies?   An early reply will greatly oblige:"

To which the water commissioner replied on August the 22nd:   "In reply to yours of the 21st relating to No. 2823 Neosho street:   The delay in repairing the house was caused by the time necessary to take proposals for doing the work. It is the intention of this department to repair, as far as practicable, the damage due to the accident and the builder has been notified to proceed with the work."

The next letter is dated September 17, and is from the water commissioner to Dammann, as follows:   "Herewith please find key of No. 2823 Neosho street.   This department, under advice of the City Counselor, having repaired the damage done your premises by a break in the water pipe."

To this, Mr. Dammann's attorneys replied on the 24th:

"We have been handed your favor of the 17th inst., which, with a key to No. 2823 Neosho street, was left on the premises of Mr. Albert Dammann, and which advises Mr. D. that your department, under advice of the city counselor, had repaired the damage done his premises by the break in the water pipe.   Mr. Dammann has had the premises inspected by two competent architects and superintendents, and they report to·him that the work has been very inefficiently done, that the floors are not level, the walls not plumb, the doors do not work, the foundation under the front chimney has been altogether left out, the house should be repainted on the inside, and the plastering repaired where cracked, all of which, if properly done, would cost the sum of $650.   But

that to properly restore the house to its proper condition, parts of it must be taken down and rebuilt, a proper foundation put underneath, all of which, if old material is used as far as possible, would cost $1,100. If the city desires to remedy these defects, the license heretofore granted to enter the premises will be extended for a sufficient time, but unless you notify us to that effect during this week, we shall have to assume that you decline to make use of the permission, and Mr. Dammann will have to prefer his claim accordingly. He certainly declines to receive the building in its present condition as a compliance with the city's duty towards him, and he can not occupy his former house because the same is, owing to insufficient foundations, still settling and sinking.

"In this connection, we call attention also to the following list of damages suffered by Mr. Dammann, by this flood:

| | |
|---|---|
| Two months' rent elsewhere | $25 |
| Moving | 12 |
| One sofa entirely destroyed | 15 |
| Two bedsteads destroyed | 14 |
| Top of wardrobe broken | 10 |
| Bureau damages, mirror broken | 9 |
| 1 large bedstead damages | 5 |
| 1 set of tools entirely lost | 25 |
| 1 pick and two spades entirely lost | 3 |
| 2 heating stoves broken | 12 |

Besides a general scratching up of all his other furniture. For all this he is entitled to and will seek redress."

To this communication the water commissioner replied on September 30th:

"Gentlemen:—In reply to yours of the 24th inst. I am advised by the city counselor that the city will pay the item:

| | | |
|---|---|---|
| For rent | $25 | 00 |
| And moving | 12 | 00 |
| | $37 | 00 |

But must decline any further expense in the matter."

Counsel for respondent contends not only that there was sufficient evidence tending to prove that the defendant's servants negligently laid and maintained the water main to take the case to the jury, but that the city by taking possession of plaintiff's premises to repair the damage it had done is estopped from denying its liability. In support of the latter proposition Chicago v. Sexton, 115 Ill. 230, is cited.

By its charter the city is authorized to establish and maintain a system of waterworks, to appoint a water commissioner who shall have charge thereof, and to charge for water furnished. "By the general consent of all courts cities supplying water for compensation are bound to exercise care in the prosecution of the work, so that they shall not negligently injure others; and they are charged with obligations similar to those that rest upon private water companies. If, therefore, there is an escape of water from the mains or reservoirs, and this is caused by the negligence of the employees of the city, the corporation will be responsible for the damages resulting." [Jones on Neg. Mun. Corps., sec. 40; 2 Dillon on Mun. Corp. (4 Ed.), sec. 980 et seq., and sec. 1048 and note; Donahoe v. Kansas City, 136 Mo. 657; Fuchs v. St. Louis, 133 Mo. 168; Werth v. Springfield, 78 Mo. 107; Carrington v. St. Louis, 89 Mo. 208; Thurston v. St. Joseph, 51 Mo. 510.] In Chicago v. Sexton, 115 Ill. loc. cit. 244, it is said: "A municipal corporation may be estopped by. the action of its proper officers, when the corporation is acting in its private, as contradistinguished from its governmental capacity, and has lawful power to do the act," and upon this *dictum* counsel seem to rely for the estoppel contended for. The application by that court of the doctrine thus broadly stated, immediately following in the next sentence of the same paragraph, shows the misapplication of the estoppel in this contention, for the court continuing says: "Here, the city had power to make a contract to do the work, and furnish the materials, done, and furnished by Sexton.

It owed the duty to prepare and furnish him with accurate plans and tracings. It had an office where these were to be kept, but, of necessity, that office was to be in charge of some one with power to preserve the maps, tracings, etc., and hand them out for the inspection of those interested. It could not be allowed that every one desiring to examine the plans and tracings should be permitted to enter the office and hunt and select for himself. The city owed the duty to have a competent person in charge of this office, and to see that he discharged his duty. His act in selecting and handing out plans and tracings was its act. There is nothing new in thus holding a municipality responsible for the want of fidelity of those who act for it."

If in the present case the plaintiffs were suing the city for damages for negligence in making the repairs, then the case of Chicago v. Sexton, *supra*, might be in point upon a like contention. But such is not the case. The plaintiffs here are suing for damages for the negligence of the city's servants in laying and maintaining the water main, and while this case is authority for estopping the city from denying its liability for their negligence in that behalf, it is no authority for the proposition that the city is estopped from denying such liability by the undertaking of its servants to repair the injury.

But it is unnecessary to pursue this contention further, for it is, we think, apparent from the foregoing statement of the facts, disclosed by the evidence, that the case was properly one to be submitted to the jury. From the condition in which the pipe was shown to be at the time of the break, it might well be inferred that the cause of the break was the settling of the loose earth in which it was laid, and the question whether or not the employees of the city were guilty of negligence in laying such a pipe in the manner and for the purpose for which it was laid in such soil in the condition in which that soil was shown to be at the time without other

foundation or support than the loose soil upon which it rested, was a proper one for the jury.

(2)    The objection urged to instruction number 1, given for the plaintiff, is that it assumes that the pipe was negligently and unskillfully laid.    As by that instruction the jury were required to find that the injury was caused by the leak and that the "leak was directly caused by the negligent and unskillful laying of said pipe" there is no assumption of either fact.    They are required to find both, the one just as much as the other.    The jury could not find that the break was caused by the negligent and unskillful laying of the pipe, without finding that it was negligently and unskillfully laid.

(3)    The objection to instruction number 3, given for the plaintiffs, is that there was no evidence tending to show the value of the building immediately before, and immediately after the accident, and hence there was no evidence upon which to base this instruction.    No objection is made to the standard laid down in this instruction for the measurement of plaintiffs' damages, and while no expert witness was called to give his opinion as to the value of the building just before and just after the accident, yet it appeared from the evidence that the building was erected some time after March 11th, 1893, and at the time of the accident could not have been more than two years old.    It further appeared how and of what materials it was constructed, what it cost, and in what condition it was at the time of the accident.    The effect of the accident upon it and the condition in which it was left afterward, and evidence tending to prove how much it would cost to restore the building to its original condition.    Surely here was evidence upon which to predicate this or any other proper instruction as to the measure of plaintiffs' damages.

(4)    On the trial plaintiffs were permitted to testify as to the damages to their furniture; their evidence tended to show its condition before and after the accident, and in one

instance the original cost of an article, but it is urged that, as they did not qualify as experts in such values and could not say whether the furniture was injured by the influx of the water, the falling of the material of the house, or in the removal from the house, and the cost is not the measure of value, the court erred in admitting this evidence. We have examined this evidence and the objections to it and find the objections purely technical. That the bursting of the pipe and the flow of the water into the plaintiffs' house, if not the immediate, was in fact the *causa causans* of all the damage to the plaintiffs' furniture is clear. The jury allowed for such damage only the sum of $64, an amount quite within the damage suffered as is apparent, from the unquestioned evidence, to any housekeeper of experience. The judgment should not be reversed on account of the objections urged to this evidence.

(5) The defendant introduced as a witness in its behalf, the city architect, who testified that he inspected the building on the 8th of August, 1895, and described the condition in which he then found it, and that "on September 9th, or about 30 days later, I found that the department had completely repaired the building." On motion of plaintiff this last statement was stricken out. He was then permitted to testify to the repairs made by the city, and their value, after which he proceeded as follows: "On February 25th, 1896, I made another inspection of the building, and I found that the conditions were about the same as at my last examination. I found everything as far as I was able to discern perfectly satisfactory." On motion of plaintiff, this statement was stricken out, the defendant excepted, and the witness continued as follows: "I found the cellar walls intact, the chimneys in place, the floors apparently level, and the doors working reasonably well. I examined the joists of the two floors and found the ceiling joists in perfect condition with the exception that on the west side the ribbon had pulled

away from the studding about an inch or an inch and a half, covering the distance of two or three joists, say four in round numbers. I put my fingers there, and found that there was a quarter of an inch of dust accumulated." "Q. From what you saw in there in that examination how long would you say it had been in that condition?" To this question plaintiff objected, the objection was sustained, and the defendant excepted. The witness then finished his evidence in chief by testifying to what it would cost to make additional repairs to the building.

We fail to find in these rulings any ground for reversing the judgment. It is sufficient to say, as to the first, that it does not appear from the abstract that any exception was saved to it. As to the second, it was wholly immaterial as to whether the building was repaired to the satisfaction of the witness or not; the character, extent and sufficiency of the repairs was the question for the jury, to be determined by them on the facts in evidence in the case, and one he could not be permitted to determine for them. And as to the third, it does not appear, and no offer was made to show, that any answer the witness would have made to the question could have affected the issues upon the merits and whatever the answer might have been, it would have been merely an opinion upon facts testified to, correct conclusions from which could as well be drawn by the jury as by the witnesses, and it was their province to draw them.

(6) Finally, it was contended that the finding for damage to the house in the sum of $900, is excessive and in face of the evidence and the court erred in not granting a new trial for that reason. The original cost of the building was shown to be between $1,700 and $1,800. It could not have been more than two years old at the time of the accident. Its condition before the accident, just after the accident, and after the repairs were made by the city, were shown in detail. Mr. Gerber, an architect and builder, who examined the

building after the repairs were made by the city, and testified to the defects then found therein, further testified as follows: "I answered last night that $650 would remedy the defects. That is the way I understood the question.   I do not think the house could ever be put back in the condition it was, for the reason it was broken in two.   The strength of the house would never be the same as before.   The only way to put the house back in the real condition, would, in my estimation, be to rebuild it.   To rebuild it, using all the material that could be used and replacing such as could not, would cost ·about $1,100."

Philip Sauerwein, a carpenter and builder, testified that he saw the building after the repairing had been done by the city, and after testifying to the defects he found in it, in chief, on cross-examination testified in substance that to take down the house and rebuild it as it ought to be built, would cost $3,000, but that "take it the way it is now and put it in right good condition it would cost $700."

The jury were the judges of the credibility of the witnesses, and of the weight of the evidence, and where there is substantial evidence to support the finding the verdict is conclusive.   The finding of the jury from all this evidence, that the damage to the house was $900, was a reasonable and legitimate inference therefrom, and the verdict must stand.

Finding no error for which the judgment of the circuit court should be reversd, the same is affirmed.

All concur, except MARSHALL, J., not sitting, having been of counsel.