MERTENS, Respondent, v. ST. LOUIS TRANSIT COMPANY, Appellant.

St. Louis Court of Appeals, December 11, 1906.

1. **STREET RAILWAYS: Contributory Negligence.** In an action for damages to plaintiff caused by a collision of his wagon with a car of the defendant, a street railway company, approaching from the rear, where the plaintiff's evidence tended to show that on account of an obstruction in the street, he was forced to drive near the track, and when he saw a car following him one hundred and fifty feet away, he quickened his pace and attempted to get past the obstruction and off the track when the car struck his wagon; this evidence was sufficient to submit to the jury the question of whether he was guilty of contributory negligence.

2. ———: **Negligence of Motorman.** Where in such case the evidence tended to show that a car travelling at the rate the defendant's evidence showed the car was travelling, could have been stopped in thirty-five or forty feet and that the plaintiff's vehicle might have been seen at a greater distance under the circumstances, the question of the motorman's negligence in failing to exercise ordinary care in the management of his car was properly submitted to the jury.

3. ———: ———: **Ordinary Care.** In such case an instruction based upon the last chance doctrine permitting a recovery if the motorman saw the danger "or would, by keeping a vigilant watch for vehicles, have seen it," etc., was properly within the rule requiring only ordinary care on the part of the motorman.

Appeal from St. Louis County Circuit Court.—*Hon. John W. McElhinney*, Judge.

AFFIRMED.

*George T. Priest* for appellant; *Boyle & Priest, George W. Easley* and *E. T. Miller* of counsel.

The court erred in overruling defendant's demurrer to the evidence, when the evidence fails to show any negligence on the part of defendant, or when plaintiff's evidence conclusively shows that his own negligence directly contributed to his injuries, the demurrer to the evidence must be sustained. McGauley v. Transit Co., 179 Mo. 583; Theobald v. Transit Co., 191 Mo. 354; Roenfeldt v. Railroad, 180 Mo. 554; Reno v. Railroad, 180 Mo. 469; Markowitz v. Railroad, 186 Mo. 350; Engleking v. Railroad, 187 Mo. 164; Zumault v. Railroad, 175 Mo. 288; Cicardi v. Transit Co., 108 Mo. App. 462.

*William L. Bohnenkamp* for respondent.

Under the decisions of this court and the Supreme Court, both old and recent, it was the duty of defendant's motorman to avoid the accident by stopping or slackening the speed of the car, to give plaintiff an opportunity to get out of the way. Schaub v. Transit Co., 112 Mo. App. 529; DeGel v. Transit Co., 101 Mo. App. 56; Klockenbrink v. Railroad, 172 Mo. 678; Schafstette v. Railroad, 170 Mo. 142; Scullin v. Railroad, 184 Mo. 691; Conrad Grocer Co. v. Railroad, 89 Mo. App. 391; Rapp v. Transit Co., 88 S. W. 865; Murphy v. Transit Co., 189 Mo. 42.

BLAND, P. J.—On December 2, 1902, between seven and eight o'clock in the evening, plaintiff's wagon, which he was driving east on Natural Bridge road, in

the city of St. Louis, was struck in the rear by one of defendant's street cars, traveling in the same direction, causing injuries to plaintiff and damaging his wagon. The action was to recover for plaintiff's personal injuries and for the damage to his wagon. The negligence alleged and relied on at the trial was a failure of the motorman in charge of the car to exercise ordinary care in the management and operation of the car, and a violation of what is commonly called the "Vigilant Watch" ordinance of the city of St. Louis.

The answer was a general denial and an affirmative allegation that "plaintiff's damages, if any, were caused by his own negligence in unnecessarily driving on and remaining on, or dangerously near, defendant's track after dark with an unlighted wagon." The affirmative defense was put in issue by a reply. The trial resulted in a verdict and judgment in plaintiff's favor for thirty-five hundred dollars, from which defendant duly appealed.

The collision occurred about seventy-five or eighty feet east of the west line of the baseball park and the old fair grounds, where the grounds on either side of the street are inclosed by high board fences. Plaintiff had delivered a load of lumber at the Lucas farm, in St. Louis county, and was returning to his home in the city over Natural Bridge road. After unloading the lumber, plaintiff coupled his wagon up short so the coupling pole projected ten or twelve feet to the rear. The wagon was drawn by two large white or gray horses, and plaintiff sat on the hounds to ride and drive, there being no bed on the wagon. The evidence shows the street was muddy and there was no gutter on the south side except a plank one which had been put in by the Baseball Association. The space between the south track and this wooden gutter was about eight feet. Plaintiff testified that he heard "car bells ringing," looked back and saw the car that collided with his

wagon, about one hundred and fifty feet west of him; that he had turned near the track on account of some iron sewer pipe lying in the gutter, and when he saw the car, realizing that it would strike his wagon, if he did not pull away from the track, he pulled his team to the south and hurried them up to get out of the way of the car, but before he could get far enough from the track the car struck the end of the coupling pole, breaking it off, hurling him into the street and burying him in the mud, resulting in severe and, according to the expert evidence, permanent injuries to his head and one knee. Plaintiff also testified that for a moment he was rendered unconscious by the fall; that he was not driving on the track and had not been on the track, but was forced to drive near it on account of the iron pipes in the gutter. According to the evidence of witnesses introduced by plaintiff, and also that of defendant's witnesses, the situation right after the collision was this: the horses were at the gutter on the south side of the street, the front wheels of the wagon were south of the track, the right hind wheel was flat on the track, the left one in the air, and plaintiff was lying in the center of the track. It had been raining during the day and was cloudy; a mist was in the air and it was dark, not extremely dark, but much darker than it would have been had the heavens been clear and the air free of mist. There were Welsbach gas lights burning along the street, one about seventy-five or eighty feet west, one opposite the place of the accident and others east at intervals of seventy-five or eighty feet.

John Homfeldt, a saloon-keeper, living two hundred feet west of the scene, on the Natural Bridge road, testified he heard the noise of the collision, ran out and saw the wagon and went to the scene; that the car was brilliantly lighted and he was enabled to see the wagon by the combined light from the car and the street lamp, but that he could not have seen it but for the street

lamp. Another disinterested witness, who was close by and on the scene in a moment after the collision, testified that while the night was dark and one would perhaps not be able to make out what an object was, the bulk of a wagon and team could have been seen one hundred feet west of the place of the accident by aid of the street lamp.

The car was not only brilliantly lighted but had a headlight. An experienced motorman testified that a headlight would throw light from thirty to forty feet ahead of the car, and that a car running at a speed of six or seven miles an hour could be stopped in thirty-five or forty feet. The conductor and motorman testified the car was running at a speed of about six or seven miles an hour. The motorman testified the headlight did not enable him to see more than twenty or twenty-five feet ahead of the car. Both the motorman and conductor testified the bell was sounded continuously on account of the darkness, and the motorman said he was keeping a sharp lookout ahead, but did not see the wagon until the car was within fifteen or twenty feet of it; that he immediately reversed the power and did all he could to stop the car to prevent a collision. The evidence shows the car stopped immediately after striking the coupling pole of the wagon. The motorman also testified the wagon was in the middle of the track. Plaintiff testified the car was running at a speed of fifteen miles per hour, but his examination shows that he came to this conclusion from having previously seen cars running on this road and not from any estimate he made, or could have made, under the circumstances, as to the speed of this particular car.

The vigilant watch ordinance was read in evidence by plaintiff. Defendant offered an instruction in the nature of a demurrer to the evidence. The refusal to grant this request is assigned as error. It is insisted that plaintiff's own evidence shows he was guilty of neg-

ligence, which directly contributed to his injury. We have failed to find such evidence in the record. Plaintiff's testimony was that he heard the car bell, looked west and saw the car coming toward him, one hundred and fifty feet away; that he immediately turned his horses out from the track to avoid the car and if he had been given a moment's more time he would have been out of the way. Plaintiff was on the proper side of the street and testified that on account of the iron pipes lying in the gutter he was forced to drive near the track, so near as to be in the way of a passing car. If this evidence is to be believed (and the jury believed it), plaintiff was not guilty of negligence, but did the best he could, in the circumstances, to avoid a collision with the car.

It is also insisted that the evidence fails to show any negligence on the part of the motorman. The evidence may preponderate in favor of this contention, yet it is not our province to pass upon the weight of the evidence but to determine whether or not there is substantial evidence to warrant the submission of the issue of fact to the jury. The evidence is, the horses drawing the wagon were large white or gray horses, the night not exceedingly dark, and there was not sufficient mist in the air to seriously obstruct the rays of light thrown out by the street lamps, one of which was within fifteen or twenty feet of the point of collision. A saloon-keeper two hundred feet to the west saw the horses and wagon immediately after the collision. It is true, he stated the light from the car aided his sight; it is also true, he said he could not have seen the wagon but for the street lamp. Another witness on the scene, who took cognizance of the situation and observed the condition of the night and the street lamps, testified that the bulk of the wagon and horses could have been seen one hundred feet from the west, and the evidence shows a car running at a speed of six or seven miles an hour could have been stopped in a space of twenty-five or thirty feet and was

actually stopped within that space. In the light of this evidence, we think there was substantial testimony tending to show negligence on the part of the motorman.

The court gave the following instruction, to which defendant objected and excepted:

"2. If the jury believe and find from the evidence in this case that Natural Bridge road was, on or about the second day of December, 1902, an open public highway in the city of St. Louis; that at said time the defendant was using the railway and car mentioned in the evidence for the purpose of transferring passengers from one point to another in said city as a street railway; and if the jury further believe and find from the evidence that on said day the plaintiff was driving in a two-horse lumber wagon in an easterly direction on or near defendant's south track on Natural Bridge road, at or near a point one hundred and fifty feet east of Vande-venter avenue in said city, and while he was so driving in said wagon upon or near said track and about the time he was in the act of driving out of or away from said track, but before he had succeeded in getting out or away from the same, an east-bound car, used by the defendant and in charge of a motorman and conductor of defendant, did run into the rear portion of the wagon on which plaintiff was driving, and that thereby plaintiff was thrown from said wagon and injured, and his wagon damaged; and if the jury further find from the evidence that the defendant's motorman in charge of said car, either saw said wagon when he was on or near said track and the danger of being struck by said car, or would by keeping a vigilant watch for vehicles, have seen said wagon upon or near said track, and the plaintiff in a position of peril, and the danger of being injured by said car, could, by stopping said car in the shortest time and space possible, under the circumstances, with the appliances at hand and consistent with the safety of said car and the persons on said car, have

averted said collision and injury, and neglected to do so; and if the jury further believe and find from the evidence that prior to and at the time of said collision, plaintiff was exercising ordinary care as defined in instruction number four, then plaintiff is entitled to recover and the jury should find a verdict in his favor."

The objection to the instruction is the use of the following clause found therein: "either saw said wagon when he was on or near said track and the danger of being struck by said car, or would by keeping a vigilant watch for vehicles." The contention is, the instruction was given to cover the common-law assignment of negligence (in the petition) and the case of Theobald v. St. Louis Transit Co., 191 Mo. 354, 90 S. W. 354, is cited as supporting this contention. In the Theobald case, defendant's car and plaintiff's wagon, on a dark night, were traveling in the same direction on the track. When the car was near the wagon, the motorman turned his head for a moment to close the door of the car. The evidence of a passenger on the platform with the motorman showed the wagon had not come into view at the time the motorman turned his head and that the moment it did come into view, or could be seen, the motorman did all in his power to stop the car. On this state of the evidence, the Supreme Court, at pages 364-5, said: "There is therefore no testimony in the case that the act of the motorman in momentarily ceasing to keep a watch ahead and in closing the door was the direct and proximate cause of the injury, nor that the motorman would have seen, or could have seen, the wagon any sooner than he did. The night was dark—some of the witnesses say very dark. The wagon had no light on it, and could not easily be seen. Unless, therefore, the court or the jury would be justified in assuming that the motorman, by the exercise of ordinary care, could have seen the wagon before he got within twenty-five feet of it, there is nothing upon which to base a liability of the defendant

in this respect." The phrase, "by the exercise of ordinary care," in the foregoing quotation is seized upon as holding that it is not the duty of a motorman, in the circumstances related, to keep a vigilant watch for vehicles on the track, and for this reason the instruction is erroneous. Ordinary care, or the care the common law requires one to exercise in and about his business, has a relative signification. It means such care as a man of ordinary prudence and foresight would be expected to exercise in like circumstances—the care commensurate with the risk and danger of the business to others. As was said by Judge SHERWOOD, in Lamb v. Railway, 147 Mo. l. c. 204, 48 S. W. 659, 51 S. W. 81, the common law, "like the mercury in the thermometer, determines to what degree prudence shall rise in order to reach the mark of ordinary care."

In Sluder v. Transit Co., 189 Mo. 107, 88 S. W. 648, Judge GANTT, in commenting on the vigilant watch ordinance, at page 137, said: "It exacts no more than ordinary care, when the conditions and circumstances to which it is applicable are considered."

In Gebhardt v. St. Louis Transit Co., 97 Mo. App. l. c. 381, 71 S. W. 448, it was said by this court: "Our understanding of the ordinance is, that as to individuals it is simply declaratory of the municipality's approval of what is commonly called 'the humanitarian, or last-chance doctrine,' to wit, that it is the duty of the motorman in charge of a running street car to keep a vigilant watch ahead, and when he sees, or by the exercise of due diligence could have seen, the peril of the plaintiff in time to have avoided injuring him, and fails to do so, the company will be liable, which is the law in this State."

There can be no doubt but that, independent of the city's vigilant watch ordinance, the humanitarian, or more properly speaking, the last fair chance doctrine, is the law of this State. [Klockenbrink v. Railway, 81 Mo.

App. 354, and cases cited; s. c., 172 Mo. 678, 72 S. W. 900; Morgan v. Railroad, 159 Mo. l. c. 280, 60 S. W. 195; Sinclair v. Railway, 133 Mo. l. c. 239, 34 S. W. 76; Reardon v. Railway, 114 Mo. 384, 21 S. W. 731; Guenther v. Railway, 108 Mo. l. c. 21, 18 S. W. 846; Schaub v. Transit Co., 112 Mo. App. 529, 87 S. W. 85.] The instruction properly presented this doctrine to the jury, and is approved. Aside from this, the vigilant watch ordinance was pleaded and offered in evidence by plaintiff, and the court, in its first instruction given for plaintiff, instructed the jury, in effect, that its violation by defendant would be negligence *per se;* and we think considered as a whole, all of plaintiff's instructions on the question of negligence are predicated on the ordinance.

No reversible error appearing, the judgment is affirmed. All concur.