EDWARD H. KAISER et al., Respondents, v. UNITED RAILWAYS COMPANY OF ST. LOUIS, Appellant.

St. Louis Court of Appeals, February 21, 1911.

1. **JURY: City of Over One Hundred Thousand Population: Qualification of Jurors: Service Within Twelve Months.** The provision in section 7342, Revised Statutes 1909, requiring the court, in cities having more than 100,000 population, to excuse from jury service a person who has served on any jury within twelve months next preceding his challenge, means within twelve months from the date the juror began service on the regular panel, and not twelve months next preceding the trial; so that a juror summoned for one week beginning with Monday of the week of the trial, and who sat on juries during that week, but not within a year prior to such Monday, was not disqualified.

2. **STREET RAILWAYS: Vigilant Watch Ordinance: Declaratory of Last Chance Doctrine.** The "Vigilant Watch Ordinance" of the city of St. Louis is simply declaratory of the municipality's approval of what is commonly called the "humanitarian or last chance doctrine."

3. **EVIDENCE: Accepting Part and Rejecting Part of Witness' Testimony: Trial Practice.** The jury may accept part of a witness' testimony, and reject part as inconsistent with the physical facts or other testimony.

4. **STREET RAILWAYS: Action for Death: Violation of "Vigilant Watch Ordinance:" Sufficiency of Evidence.** Evidence, in an action against a street railway company for the death of a child, which was run over by a street car, *held*, to sustain a finding that the motorman was negligent in not keeping a vigilant watch and in failing to stop the car after discovering decedent's danger.

5. ———: ———: ———: **Instruction: Assumption of Facts.** An instruction, in an action for a boy's death by being struck by a street car, requiring the jury to find, in order to return a verdict for plaintiff, that the car was allowed "to strike and cause the death of" decedent, "in consequence of the failure of the motorman, . . . immediately prior to such casualty, to keep a vigilant watch," did not assume that the motorman failed to keep a vigilant watch.

6. ———: ———: ———: ———: **Care Required.** An instruction, in an action against a street railway company for killing a boy on the track, that it was the motorman's duty "to stop said car within the shortest time and space possible with the means at his command upon the first appearance of danger to" decedent was not erroneous as requiring the exercise of the highest degree of care, while the law only required the exercise of ordinary care, since no reasonable man could have understood the instruction to mean anything else than that it was the motorman's duty, after the danger to the child became apparent, to stop the car as soon as he could, considering its size, brakes and other equipment, its speed, the ease with which it could be stopped, the grade of the street and the motorman's strength and ability; and to require that duty of him was to require merely the ordinary care imposed upon him by the law, under the circumstances.

Appeal from St. Louis City Circuit Court.—*Hon. J. Hugo Grimm,* Judge.

AFFIRMED.

*George T. Priest* for appellant.

(1)   The court erred in overruling defendant's challenge for cause on their voir dire to jurors Benton F. Dowling, George Knopfer and Isaac Kopf, for having served upon a jury within twelve months preceding the date of the trial of this cause. Sec. 6547, R. S. 1899; Williamson v. St. Louis Transit Company, 100 S. W. 1078.   (2)   The court erred in overruling defendant's demurrer to the evidence, there being no negligence shown on the part of defendant. King v. Railroad, 211 Mo. 13; McGee v. Railroad, 214 Mo. 530; Metz v. Railroad, 217 Mo. 275.   (3) The court erred in giving instruction No. 1 on behalf of plaintiff: (a.) Because said instruction submits both primary and secondary negligence to the jury.   Krehmeyer v. United Railways Company of St. Louis, 220 Mo. 639; Hough v. Co., 123 S. W. 83. (b.)   Because said instruction assumes that the motorman in charge of the car failed to keep a vigilant lookout for pedestrians about to approach the car tracks. (c.)   Because said instruction fails to submit the duty of care required of motorman in handling the car under such circumstances.   (d.)   The instruction annihilated the law of concurring contributory negligence.

*Richard A. Jones* and *William J. Jones* for respondents.

(1)   The court properly overruled defendant's challenge for cause on their voir dire to jurors Fenton F. Dowling, George Knopfer and Isaac Kopf, for having served upon a jury within twelve months next preceding the date of trial.   Sec. 6547, R. S. 1899; Burden v. People, 26 Mich. 162, 164; Michigan Session Laws 1869, p. 106, par. 3; Garcia v. The State, 5 Tex. App. Rep. 337, 339; Texas Session Acts, 1876, p. 83, sec. 26; Karlson & Hanson v. Holin, 95 N. W. Rep. 1125; Williamson v. St. Louis Transit Co., 200 Mo. 345; Secs. 3770, 3772, 3775, 3787, 3789, 3795, 3797, 3799, 6558, 6567, R. S.

1899; 1905 Session Acts, pp. 174-177; 1903 Session Acts, p. 209. (2) The court did not err in overruling defendant's demurrer to the evidence, as there was a sufficient showing of negligence on the part of defendant to submit the case to the jury. (3) The court properly gave Instruction No. 1 on behalf of plaintiffs: (a.) The instruction did not submit both primary and secondary negligence to the jury. The two acts of negligence submitted were positive, affirmative duties incumbent upon the motorman, each of which was consistent with the other. McQuade v. Suburban Ry. Co., 200 Mo. 150, 156. (b.) Said instruction does not assume that the motorman in charge of the car failed to keep a vigilant watch or lookout for pedestrians about to approach the car tracks. (c.) The vigilant watch ordinance, embodied in this instruction, is simply declarative of the common law as applied to the operation of a dangerous instrumentality upon the streets of a populous city like St. Louis, as is required the motorman to exercise ordinary care under the circumstances. Kolb v. St. Louis Transit Co., 102 App. 143, 155; Mertens v. St. Louis Transit Co., 122 App. 304; Sluder v. St. Louis Transit Co., 189 Mo. 107; Riska v. Railroad, 180 Mo. 168; Hovarka v. St. Louis Transit Co., 191 Mo. 414; Deschner v. Railroad, 200 Mo. 310, l. c. 329. (d.) The instruction did not annihilate the law of concurring contributory negligence. It submitted to the jury the humanitarian or Last Chance rule. Kolb v. St. Louis Transit Co., 102 Mo. App. 143, 153; Waddell v. Railroad, 213 Mo. 8.

STATEMENT.—Suit to recover penalty under section 5424 of the Damage Act for the negligent killing of plaintiffs' minor child. Plaintiffs had verdict and judgment for $7000 and defendant appealed.

Gravois Road, a well traveled public thoroughfare, runs north and south in the city of St. Louis, crossing Milentz Avenue at right angles, in a fairly well inhabited vicinity. At and north of said crossing, Gravois is a dirt

road, without paved sidewalks. There is a grocery store in the rear part of a building at the northwest corner of Gravois and Milentz the entrance to which is on Gravois. A nice cinder path runs all the way along the eastern side of Gravois. The western side is not so blest. There, the pathway is cindered from Milentz north about forty-two feet, but beyond that just a dirt path for 150 feet and then a gulley. Such was the situation on November 13, 1907. Defendant owned and operated a double track electric street car line along Gravois Road. Its north-bound cars ran on the eastern and its south-bound cars on the western, track. The distance from the eastern edge of the dirt path on the west side of Gravois to the eastern rail of defendant's north bound track was twenty-six feet, six inches. On the day just mentioned one of these north-bound cars run down and killed plaintiffs' seven and one-half year old son. The little fellow came out of the grocery store and walked north along the dirt path on the west side. He was accompanied by a boy of his own age named Gussie. The day was fair and clear but growing dusk. Gussie testified that the two boys went at a walk along the dirt path to a point about 105 feet north of the north line of Milentz avenue, when James, plaintiffs' son, said that he was going across the street because the path was better there and started across at an angle, running slowly. Gussie called after him, "there is a car coming, James", but James gave no indication that he heard and kept on running, apparenty oblivious to the impending danger. The evidence showed that James was knocked down and run over and killed as he reached the east rail of the north bound track. Gussie did not see the car hit James; he thought James had gotten safely across until he saw him lying dead on the east rail. The testimony of defendant's motorman in charge of the car is not altogether clear or consistent, but in effect he stated that as the front of his car, which was running at a speed of seven to nine miles an hour, was about fifteen feet across

the north line of Milentz avenue, he saw the boys just opposite the grocery, going north along the path at a run, one boy in front. That they were about twenty feet ahead of the car when he saw James run into the street toward the tracks and get on the track about ten or fifteen feet ahead of the car; that he tried to stop but could not do it in time to avoid injuring the boy. The boy was running about half as fast as the car was going. The witnesses for the defendant agreed that the car was stopped with extreme suddenness. One of them, who was sitting on the sand box by the motorman, testified that the boy came on the track about four feet in front of the car and the motorman stopped the car with such suddenness as to throw him violently against the window. An experienced motorman testified that a car going at the rate of seven to nine miles an hour could have been stopped within twenty-five feet.

The evidence on behalf of the plaintiffs tended to prove that the spot where the body lay after the car was about 173 feet north of Milentz. The car was 30 feet long. When it was stopped its rear end was twelve or fifteen feet north of where the body lay. There were pieces of skull and spatters of blood and brain for twelve feet south of the body. The street was unobstructed to the view for a distance of eight hundred feet south of where the boy was found. Two of the plaintiffs' witnesses testified that the light was such that they could see clearly in any direction for a distance of one hundred and fifty feet.

The plaintiffs introduced in evidence the ordinance of the city of St. Louis familiarly known as the "Vigilant Watch Ordinance". One charge of negligence contained in the petition was, that defendant's motorman and conductor "failed to keep a watch ahead of said car for persons, especially children, on defendant's track or approaching towards it, and failed to control or stop said car and thus prevent it from striking and killing

155 App.—28

plaintiffs' said son, after they saw, or by the exercise of ordinary care, could have seen him in a position of danger." Another charge was that defendant's motorman "negligently failed to observe the requirements of the Vigilant Watch Ordinance, in that he, immediately prior to striking and running over plaintiffs' son, as aforesaid, negligently failed to keep a vigilant watch for all persons on foot, especially children, either on the track or moving towards it, and negligently failed to stop said car within the shortest space and time possible upon the first appearance of danger to plaintiffs' said son." The answer was a general denial, coupled with a plea of contributory negligence.

At the request of the plaintiffs, the court instructed the jury as follows:

"The court instructs the jury that it was the duty of the motorman of defendant in charge of the car which struck James Kaiser to keep vigilant watch for all persons on foot, especially children, either on the track over which such car was about to be operated, or moving towards such track, and on the first appearance of danger to such persons or children, to use the means at his command to stop the car in the shortest time and space possible and if the jury believe from the evidence that on the thirteenth day of November, 1907, plaintiffs were husband and wife and the parents of James Kaiser, a minor under the age of twenty-one years, and that on said date between the hours of five and six o'clock in the afternoon, a north-bound car of defendant in charge of its conductor and motorman was allowed to strike and cause the death of said James Kaiser while he was crossing Gravois avenue a short distance north of its intersection with Milentz avenue, and that said Gravois avenue was then a public highway in the city of St. Louis; then if you further find from the evidence that said car was so allowed to strike and cause the death of said James Kaiser, in consequence of the failure of the motorman of defendant operating same immediately

prior to such casualty to keep vigilant watch for persons moving towards the track over which said car was about to operate, or in failing to stop said car within the shortest time and space possible with the means at his command, upon the first appearance of danger to said James Kaiser, or when by keeping such vigilant watch the danger to him would have become apparent, then plaintiffs are entitled to recover against the defendant, even though the jury should believe from the evidence that James Kaiser did not exercise ordinary care in going upon the track over which such car was being operated at the time and place in question."

CAULFIELD, J. (after stating the facts).—I. Defendant assigns as error the action of the trial court in overruling defendant's challenge of three jurors on the ground that each of them had served on a jury within 12 months next preceding the date of trial. The evidence showed that each of them had been summoned for jury service for one week beginning with Monday of the week in which this case was tried and that they had sat upon juries during that week but that they had not served upon any jury within a whole year prior to Monday of that week. The question involved in this assignment of error received the consideration of the Springfield Court of Appeals in the recent case of Blyston-Spencer v. United Railways Company of St. Louis, 132 S. W. 1175, 1177. On a review of the authorities and statutes that court held that the language of section 6547, Revised Statutes 1899, which is now section 7342, Revised Statutes 1909, "And it shall be the duty of every court of record in said city to excuse from service as a juror every person who, being examined on the *voir dire*, shall appear to the court to be a person whose name ought not to have been placed upon the jury list under the provisions of this article, or who served on any jury in any court of this state within twelve months next preceding, if challenged for that cause, by either party

to the suit; and the court may excuse such person without challenge by either party," means within twelve months from the date the juror began service as a juror on the regular panel and not twelve months next preceding the date of the trial. The conclusion arrived at in that case on this question meets with our approval, and this assignment of error is not sustained.

II. Defendant assigns as error the action of the trial court in refusing to direct the jury to find a verdict for it. It is difficult to imagine a case where such a direction would have been more uncalled for than in this. While the petition purports to declare on the "Vigilant Watch Ordinance" and also upon the "humanitarian or last chance doctrine," as if they were separate and distinct in their nature, the two were, in effect, the same. The ordinance "is simply declaratory of the municipality's approval of what is commonly called the 'humanitarian or last chance doctrine.'" [Gebhardt v. St. Louis Transit Co., 97 Mo. App. 373, 380, 71 S. W. 448; Mertens v. Transit Co., 122 Mo. App. 304, 312, 99 S. W. 512.] The parties recognize this and agree that the only assignment of negligence proper to be considered by the jury were, failure of the motorman to keep a vigilant watch, and failure to stop the car within the shortest time and space possible, etc. Defendant contends that neither of them was sustained by the proof. Its theory is that the most vigilant watch on the part of the motorman would not have prevented the accident because it was too dark to see more than a few feet and the deceased darted out upon the track so suddenly and so immediately in front of the approaching car that to strike him was unavoidable. There was some evidence tending to prove that the dusk of the evening made objects indistinguishable unless very near, but there was also ample evidence to the contrary. It was testified in behalf of the plaintiffs and entirely uncontradicted that the view of the motorman as he approached the

place where the boy was run over, was unobstructed for
some eight hundred feet, and two witnesses for the plain-
tiffs testified that even after the boy was run over it was
light enough to see clearly for over 150 feet in any di-
rection. There was also some evidence that deceased ran
on the track so immediately in front of the approach-
ing car that the motorman had no reasonable opportu-
nity to stop in time to avoid injuring him, but here too
there was ample evidence tending to prove the contrary.
While the motorman's testimony is somewhat obscure
and contradictory, he did testify quite clearly that he
saw the boys running along the pavement and that he
saw James run out into the street from the sidewalk.
He also testified quite emphatically that the front part
of the car was only fifteen feet north of Milentz when
James left the sidewalk to run toward the track. The
jury were justified in accepting these statements as true,
while at the same time rejecting, as inconsistent with
the physical facts and other testimony, this interested
witness's testimony that the boy ran very suddenly
upon the track from a point opposite the grocery and
only twenty feet north of the car. Gussie, the dead
boy's playmate, testified that James started on a slow
run from a point 105 feet north of Milentz or ninety
feet north of the point where the motorman says the
front of the car was at the time; that he ran at an angle
northeastwardly toward the north-bound track. The po-
sition of the body when found and the blood stains to
the south indicate that James reached the track at a
point about 160 feet north of Milentz or 145 feet north
of where the motorman says the front of the car was
when he saw the boy start toward the track. We deem
the proof most persuasive that the motorman made no
effort to stop, until just before, if not after, he had run
the boy down. The man on the sand box, testifying
for defendant, said that the boy did not come on the
track until the car was within four feet of him. The
defendant's witnesses agreed that it was a very sudden

stop, yet when the stop was completed the front of the car was at least forty-two feet beyond where the boy's body lay and some fifty-four feet beyond where the first spatter of brains and blood were found, and about 200 feet north of where the motorman testified the front of the car was when the boy started toward the track. That James started from the point where Gussie said he did and that the car was only fifteen feet north of Milentz when James started, is borne out by a comparison of the speed of the car and the speed of the boy. The motorman said that the boy was going about half as fast as the car. Then while the car was going 145 feet the boy must have gone some 72 1-2 feet, which in the direction he was traveling and allowing for him not running in a perfectly straight line, and for slight inaccuracies in the estimates of distances and speed, was approximately the distance between where Gussie said he started from and the point where the first blood and brain spatter was found on the track.

It may then be said that the jury was justified in finding from the evidence that the motorman traveled about 140 feet, and until it was too late, without attempting to stop, and all the time he saw, or by the exercise of ordinary care could have seen, this child running into a situation of great peril, and he in charge of a car which could have been stopped within twenty-five feet.

III. The defendant asserts that the court erred in giving instruction No. 1 in behalf of plaintiffs. The defendant complains first that the instruction "assumes defendant's motorman failed to keep a vigilant watch." After requiring the jury to find that the car "was allowed to strike and cause the death of said James Kaiser," etc. the instruction requires them to "find from the evidence that said car was so allowed to strike and cause the death of said James Kaiser, in consequence of the failure of the motorman of defendant operating same immediately prior to such casualty to keep vigilant watch," etc. This last quoted part of the instruction

is the part which defendant contends "assumes defend-
ant's motorman failed to keep a vigilant watch." The
language is not susceptible of that construction. It re-
quired the jury to find the fact claimed to have been
assumed by it. The jury could not find that the car was
allowed to strike and cause the death of James in con-
sequence of the failure of the motorman to keep a vigi-
lant watch without finding that he was guilty of such
failure. Instructions similar in regard to this feature
were sustained in Geary v. Kansas City, O. & S. R. Co.,
138 Mo. 251, 259, 39 S. W. 774; Phippin v. Mo. Pac.
Ry. Co., 196 Mo. 321, 348, 93 S. W. 410; Dammann v.
City of St. Louis, 152 Mo. 186, 198, 53 S. W. 932. De-
fendant also complains of that part of this instruction
which required of the motorman the duty "to stop said
car within the shortest time and space possible with
the means at his command, upon the first appearance
of danger to said James Kaiser" etc., contending that
it imposes the duty to exercise the highest degree of care
to stop the car, while the law imposed the duty to exer-
cise only ordinary care to stop the car. If the words
"to stop in as short a space and time possible" are con-
strued as signifying to stop in as short a space and time
as the employment of the most expert motorman, the
use of the most approved appliances and the presence
of the most ideal conditions, would permit, then the in-
struction might be said to impose an excessive degree of
care upon the defendant. That would be construing
them to require whatever was attainable by the utmost
human endeavor and foresight. But that is not the
meaning to be given them here. They are not stronger
words than "forthwith," "immediately" or "as soon as
possible," to which, in proper cases, the courts have re-
fused to give any such extreme meaning. Where con-
tracts have required notice to be given, or accounts to
be rendered, goods to be shipped, or work to be done,
"forthwith," "immediately," or "as soon as possible,"
they have been construed to require such notice to be

given or things to be done, with "due diligence under the circumstances of the case;" "within a reasonable time;" "as soon as it could be under the circumstances," or "as soon as practicable." [Phillips v. Protection Ins. Co., 14 Mo. 220, 231; McFarland v. Association, 124 Mo. 204, 27 S. W. 436; Palmer v. Insurance Co., 44 Wis. 201, 208; Arthur v. Wright, 10 N. Y. Supp. 368, 369; Pope v. Filley (U. S.), 9 Fed. 65, 70.] We are not citing these cases or quoting from them as furnishing any hard and fast definition or rule, but we do think they indicate that expressions akin to the one we are considering are to be construed in the ordinary reasonable sense in which such expressions are used in the ordinary language of life. Being used with a definite suggestion of concrete ways and means, they are to be understood as having reference to such ways and means and not to some other, ideal ways and means. No reasonable man could have understood the court to mean anything else than that it was the duty of the motorman, after the danger to the child became apparent to him, to stop the car as soon as he could, considering its size, the grade of the street, the car's speed, its brakes and other equipment, the ease with which it could be stopped, and the motorman's strength and ability. To require that duty of him was to require of him what was merely the ordinary care imposed upon him by the law, under the circumstances. The language used by the instruction has been approved by our Supreme Court as being more intelligible, when applied to a case like this than the technical term "ordinary care" and its stereotyped definition. [Hovarka v. Transit Co., 191 Mo. 441, 454, 90 S. W. 1142; See, also, Spencer v. Transit Co., 222 Mo. 310, 324, 121 S. W. 108.] This assignment of error is not well taken.

We have given due consideration to all the questions raised by counsel for defendant, but find no reversible error in the case. The judgment is affirmed. *Reynolds, P. J.,* and *Nortoni, J.,* concur.